# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| **MICHELLE S.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION FILE NO.** |
| | : | **1:17-cv-01017-AJB** |
| **COMMISSIONER, SOCIAL** | : | |
| **SECURITY ADMINISTRATION,** | : | |
| | : | |
| **Plaintiff.** | : | |

## ORDER AND OPINION[1]

Plaintiff Michelle S. ("Plaintiff") brought this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") under the Social Security Act.[2] For the reasons below, the undersigned **REVERSES** the final decision

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (*See* Dkt. Entries dated 12/20/17 & 12/21/17). Therefore, this Order constitutes a final Order of the Court.

[2]     Title II of the Social Security Act provides for DIB. 42 U.S.C. § 401 *et seq.* Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, provides for SSI benefits for the disabled. SSI claims are not tied to the attainment of a particular period

of the Commissioner **AND REMANDS** the case to the Commissioner for further proceedings consistent with this opinion.

## I.    PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on February 24, 2014, alleging disability commencing on June 25, 2012. [Record (hereinafter "R") 166]. Plaintiff's applications were denied initially and on reconsideration. [*See* R59-60, 99-100]. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). [R117-18]. An evidentiary hearing was held on February 5, 2016. [R35-58]. The ALJ issued a decision on March 7, 2016, denying Plaintiff's application on the ground that she had not been under a "disability" from the alleged onset date through the date of the decision. [R18-29]. Plaintiff sought review by the Appeals Council, and the Appeals

---

of insurance eligibility. *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982). Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI. *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).  In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim. *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI). Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims, and vice versa.

AO 72A
(Rev.8/8
2)

Council denied Plaintiff's request for review on February 1, 2017, making the ALJ's decision the final decision of the Commissioner. [R1-4].

Plaintiff then initiated an action in this Court on March 21, 2017, seeking review of the Commissioner's decision. [Doc. 1]. The answer and transcript were filed on November 22, 2017. [*See* Docs. 17, 18]. On December 20, 2017, Plaintiff filed a brief in support of her petition for review of the Commissioner's decision, [Doc. 22]; on January 19, 2018, the Commissioner filed a response in support of the decision, [Doc. 23]; and on February 2, 2018, Plaintiff filed a reply brief in support of her petition for review, [Doc. 25]. The matter is now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs,[3] and it is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.     STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment or

---

[3]     Neither party requested oral argument. (*See* Dkt.).

AO 72A
(Rev.8/8
2)

impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment

4

meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity ("RFC"), age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id*.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any

5

substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## III.   SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner. Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam);

AO 72A
(Rev.8/8
2)

*Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## IV.  PLAINTIFF'S CONTENTIONS

As set forth in Plaintiff's brief, the issues to be decided are as follows:

7

AO 72A
(Rev.8/8
2)

1. Whether the ALJ offered good cause for rejecting the opinion of Patsy H. Zakaras, Ph. D.

2. Whether the ALJ gave sufficient weight to the opinion of Stefan Massong, Ph. D.

3. Whether the ALJ considered all of the relevant factors before rejecting Plaintiff's testimony about her symptoms.

[Doc. 22 at 2].

## V. STATEMENT OF FACTS[4]

### A. Background

Plaintiff was forty-one years old on the date of the hearing. [R39]. She had completed two years of college and last worked in June 2012 as a radiologic technologist for Emory University. [R39-40]. She claims that she is unable to work due to mental illness. [R42].

### B. Lay Testimony

Plaintiff testified that problems stemming from mental illness had begun gradually and were triggered by the stress of her workload and her interactions with supervisors. [R42-43]. She stated that the mental illness affected her reading comprehension and her ability to multitask. [R45-46]. She also reported that she could

---

[4] In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal. [*See* Docs. 22, 23, 25].

no longer leave food unattended on the stove because she had almost burned the house down in the past, [R48, 52], and that her sister had to assist her with household chores because she lacked the motivation to complete those tasks, [R48, 50-51]. She stated that she did not watch much television, did not use a computer, and her only social activity was attending church twice a week. [R48-49].

C.    *Medical Records*

On June 25, 2012, Plaintiff presented to Dipak Vashi, M.D., of the Emory Clinic with complaints of stress and anxiety. [R398-402]. She reported that she was under stress because she was not getting along with one of her supervisors at work. [R398]. Plaintiff reported having anxiety episodes while driving to work, having difficulty concentrating, and sometimes breaking out in crying spells. [R398]. Dr. Vashi noted that Plaintiff was cooperative and had a normal mood and judgment but was very tearful during the examination. [R401]. He assessed Plaintiff with depression, anxiety, and insomnia and prescribed Zoloft[5] and Ambien.[6] [R401].

---

[5]    Zoloft (sertraline) is a selective serotonin uptake inhibitor ("SSRI") used to treat depression, obsessive-compulsive disorder, panic attacks, post-traumatic stress disorder ("PTSD"), and social anxiety disorder. MedlinePlus, Sertraline, https://medlineplus.gov/druginfo/meds/a697048.html (last visited 8/8/18).

[6]    Ambien (zolpidem) is a sedative-hypnotic that is used to treat insomnia. MedlinePlus, Zolpidem, https://medlineplus.gov/druginfo/meds/a693025.html (last

AO 72A
(Rev.8/8
2)

Plaintiff began counseling with clinical psychologist Dr. Zakaras in July 2012. [R272]. In October 2012, Dr. Zakaras wrote a note to Plaintiff's employer indicating that Plaintiff remained in treatment with her and would need to remain off work indefinitely. [R271].

In a treatment summary dated November 20, 2012, Dr. Zakaras recalled that Plaintiff had been seen in her office for fifteen counseling sessions. [R272]. She also wrote that Plaintiff was unable to face the responsibilities of her job, was "trying to sort out the personal issues that have led to this dysfunctional state," was making "slow, but steady progress," and was compliant with all treatment recommendations. [R272]. Dr. Zakaras further observed that Plaintiff had isolated herself from others, even though she was normally an outgoing person who enjoyed interacting with other people, and she diagnosed Plaintiff with major depressive disorder, severe, without psychotic features. [R272].

Plaintiff presented to Ara Travers, M.D., at South Coast Physicians on December 10, 2012, with worries about hypoglycemia and complaints of anxiety.

visited 8/8/18).

[R275-76]. Dr. Travers noted that Plaintiff had been prescribed Zoloft and Celexa[7] for depression, that those medications were also indicated for anxiety, and that Plaintiff did not appear to be depressed during her examination. [R275]. Following a brief physical exam, Dr. Travers assessed Plaintiff with stress and anxiety, prescribed BuSpar,[8] and refilled her Ambien for reported insomnia. [R276].

On January 3, 2013, Plaintiff began seeing a new primary care physician, Dionne Jackson, M.D. [R344]. Plaintiff told the doctor that she had been working as a radiology technician but had recently taken leave from her job due to stress. [R344]. Plaintiff stated that she was an "emotional wreck" and needed something to help relax her, but she also stated that her finances were good, that she "really ha[d] no worries," and that she felt that she was "very blessed." [R344]. She complained of appetite changes (she was always hungry and thirsty); fatigue; malaise; headaches; and difficulty sleeping. [R344]. Plaintiff also noted that she was using BuSpar for her

---

[7]     Celexa (citalopram) is an SSRI that is often used to treat depression. https://medlineplus.gov/druginfo/meds/a699001.html (last visited 8/8/2018).

[8]     BuSpar (buspirone) is used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety. MedlinePlus, Buspirone, https://medlineplus.gov/druginfo/meds/a688005.html (last visited 8/8/18).

AO 72A
(Rev.8/8
2)

anxiety but that the medication made her feel tired; that she was taking Ambien for insomnia; and that she was prescribed Zoloft in the past but did not take it. [R344].

Dr. Jackson observed that Plaintiff made good eye contact during the examination; was well-oriented and well-groomed; had rapid but otherwise normal speech; and displayed an appropriate mood and affect. [R345]. Dr. Jackson diagnosed Plaintiff with anxiety, stopped her prescription for BuSpar, and directed her to take clonazepam[9] twice per day. [R345].

Dr. Zakaras also filled out a behavioral health evaluation for Plaintiff's long-term disability insurer on January 11, 2013. [R352]. She checked boxes indicating that Plaintiff had "moderately severe" to "severe" limitations in each of the sixteen areas that she was asked to evaluate. [R352]. On an attached questionnaire dated December 19, 2012, Dr. Zakaras wrote that Plaintiff was severely depressed; was unable to deal with any type of work stress; could not work with patients; and could not cope with other people. [R354, 356]. She also wrote that Plaintiff had problems with

---

[9]    Clonazepam, also sold under the brand name Klonopin, is a benzodiazepine that is used to control certain types of seizures and to relieve panic attacks. MedlinePlus, Clonazepam, https://medlineplus.gov/druginfo/meds/a682279.html (last visited 8/8/18).

AO 72A
(Rev.8/8
2)

her attention and concentration and that Plaintiff would need to remain off work for an undetermined amount of time.[10]  [R355-56].

Plaintiff continued to attend therapy sessions with Dr. Zakaras.  [R348].  The doctor's handwritten notes for January 28, 2013, show that Plaintiff reported increased stress following the death of her cousin and her friend's mother.  [R348].  She was trying to find things outside of the home to keep her busy.  [R348].

On June 13, 2013, Plaintiff told Dr. Jackson that she continued to have anxiety.  [R339].  She stated that she had taken Klonopin and Valium[11] but that the medications did not work well for her; that she was having severe trouble with her sleep; that as long as she was active, she was okay, but she tended to feel "down and depressed" when she was alone or inactive; that she felt as though she was on an "emotional roller coaster"; that she was not able to relax; and that she had considered checking into a treatment facility.  [R339].  A psychological exam was normal, but Dr. Jackson

---

[10]  The Court recognizes Plaintiff's contention that Dr. Zakaras attached copies of her handwritten notes and treatment summaries to the questionnaire. [Doc. 22 at 5 (citing [R347-48, 353, 357-61])].  This does not appear to be entirely correct, as some of the notes allegedly attached to Dr. Zakaras's opinion bear later dates than the opinion itself.  [*Compare* R352 *with* R347-48].

[11]  Valium (diazepam) is typically used to relieve anxiety, muscle spasms, and seizures.  MedlinePlus, Diazepam, https://medlineplus.gov/druginfo/meds/a682047.html (last visited 8/8/18).

AO 72A
(Rev.8/8
2)

assessed anxiety and insomnia based on Plaintiff's reports; advised Plaintiff to continue taking clonazepam; and prescribed trazodone[12] for Plaintiff's insomnia.  [R339-40].

William Pearson, M.D., examined Plaintiff on July 23, 2013, upon referral by Dr. Zakaras.  [R412].  Dr. Pearson observed that Plaintiff had normal but mildly overproductive speech, had a depressed mood, and was tearful at times, but had good cognition, thought process, insight, judgment, and impulse control.  [R414].  Dr. Pearson assessed Plaintiff with anxiety and depression and prescribed Zoloft and trazodone.  [R412, 415].

At a follow-up appointment with Dr. Pearson on August 27, 2013, there was no significant improvement in Plaintiff's reported symptoms.  [R409-10].  Plaintiff had discontinued Zoloft after one week because she felt it made her increasingly anxious, subjectively cold, and nauseous.  [R409].  Plaintiff reported family stressors but also stated that she had been enjoying spending time with her friends.  [R409].  Dr. Pearson stopped Zoloft and trazodone and started Plaintiff on a trial of Remeron.[13]  [R410].

---

[12]     Trazodone is a serotonin modulator typically used to treat depression. MedlinePlus, Trazodone, https://medlineplus.gov/druginfo/meds/a681038.html (last visited 8/8/18).

[13]     Remeron (mirtazapine) is an antidepressant medication.  MedlinePlus, Mirtazapine, https://medlineplus.gov/druginfo/meds/a697009.html (last visited 8/8/18).

AO 72A
(Rev.8/8
2)

Notes from Dr. Zakaras's practice show that Plaintiff continued to receive therapy for the second half of 2013. [R347]. She was noted to be "progressing daily" and setting goals in her life. [R347]. In November of 2013, Plaintiff stated that she wanted to "look towards some future return to work." [R347]. A later disability report form from Dr. Zarakas's office indicates that Plaintiff's treatment terminated on November 17, 2013, "as depression resolved." [R270].

In February 2014, Plaintiff sought treatment at the Coastal Family Health Center for anxiety, stress, and insomnia. [R297]. The attending physician, Karen Purdy, M.D., noted that Plaintiff was oriented to time, person, and place, her memory was intact, and her mood was euthymic.[14] [R298]. She also noted that Plaintiff displayed an appropriate affect during the examination. [R298]. Dr. Purdy diagnosed Plaintiff with generalized anxiety disorder and an acute stress reaction and prescribed one milligram of alprazolam[15] to be taken three times per day. [R298].

---

[14] "Euthymic" relates to a moderate mood—"not manic or depressed." *PDR Med. Dictionary* 606 (1st ed. 1995).

[15] Alprazolam, also commonly sold under the brand name Xanax, is a benzodiazepine typically used to treat anxiety disorders and panic disorder. MedlinePlus, Alprazolam, https://medlineplus.gov/druginfo/meds/a684001.html (last visited 8/8/18).

AO 72A
(Rev.8/8
2)

On March 31, 2014, John Stoudenmire, Ph. D., performed a consultative examination. [R287-90]. Plaintiff told the doctor that she was suffering from severe depression, anxiety, panic attacks, and stress; that her sleep problems were her main medical problems; and that the only medication she was taking was Xanax from Dr. Purdy. [R287-88]. When Dr. Stoudenmire asked what Plaintiff did on a typical day, she stated, "just whatever," and reported that she was trying to do some volunteer work in order to get out of the house. [R288].

Dr. Stoudenmire noted that Plaintiff was personable and talked "quite freely" during the interview. [R289]. She denied any hallucinations but acknowledged that she sometimes had thoughts about killing herself while driving. [R289]. Plaintiff stated that she gets very depressed but tries to find some "pleasantness" in her life by helping people or going to church. [R289]. She complained of fatigue, feelings of worthlessness, and excessive guilt over her situation. [R289]. She was anxious about driving and "many little things." [R289]. Plaintiff also admitted to feelings of irritability, but she had never become violent or destructive. [R289].

Dr. Stoudenmire noted that Plaintiff appeared to have no psychotic or manic symptoms; that her reports of hearing a voice while she was driving actually sounded more like a thought than a voice; that Plaintiff's speech was organized; and that she did

16

not display any bizarre behavior.  [R289].  Dr. Stoudenmire further noted that Plaintiff performed "rather poorly" during the cognitive portion of the examination and that her judgment was "weak":  Plaintiff was able to recall three digits forwards, but it took her two tries to recall three digits backwards; she stated that she would not do anything if she found a stamped, sealed envelope on the street; she could not identify the purpose of paying taxes or of child labor laws; she could describe what a thermometer is used for and the number of weeks in a year, but she could not name the continent that Brazil is on or the President of the United States during the Civil War; and she correctly identified two of the four states that border Mississippi.  [R289-90].  Overall, Dr. Stoudenmire believed that Plaintiff's cognitive skills were "much lower than would be expected for someone who has a two-year college degree."  [R290].

Dr. Stoudenmire concluded that Plaintiff was suffering from major depressive disorder, with anxiety features but without psychosis.  [R290].  The doctor wrote that Plaintiff's interaction with others in the workplace "would be characterized by general pleasantness and an absence of confrontation."  [R290].  He also opined that Plaintiff's attention and concentration were "fair at best"; that Plaintiff had only a marginal ability to manage any funds that might be assigned to her; and that Plaintiff had a "poor" prognosis over the next twelve months, although he believed that Plaintiff might

17

improve significantly in the future if she could get involved in regular counseling and medication services. [R290].

On April 7, 2014, Plaintiff returned to Coastal for medication refills and to obtain a referral to counseling for continued problems with depression and anxiety. [R295]. She stated that she was suffering from significant insomnia, which was causing her to feel fatigued during the day. [R295]. She also described periods of deep depression followed by periods of elation. [R295]. Upon examination by William Ross, M.D., Plaintiff was found to have appropriate judgment and insight, a euthymic mood, and an appropriate affect. [R296]. Dr. Ross diagnosed an adjustment disorder with mixed anxiety and depression, and he prescribed alprazolam, citalopram, and risperidone.[16] [R296].

On April 15, 2014, state agency physician Vicki Prosser, Ph. D., reviewed the record and opined that Plaintiff appeared capable of understanding and carrying out instructions, could maintain attention and concentration adequately for two-hour periods in an eight-hour workday, could complete a normal forty-hour week of work

---

[16] Risperidone is in a class of medications known as atypical antipsychotics. It is typically prescribed to treat symptoms of schizophrenia, mania, and bipolar disorder and is also used to treat behavior problems, such as aggression, self-injury, and sudden mood changes. MedlinePlus, Risperidone, https://medlineplus.gov/druginfo/meds/a694015.html (last visited 8/8/18).

AO 72A
(Rev.8/8
2)

without excessive interruptions from psychological symptoms, could relate appropriately to coworkers and supervisors on a limited basis, and could adapt to a job setting, but was incapable of performing other work. [R64-65, 68, 73-74, 77].

On May 12, 2014, Plaintiff returned to Coastal for refills of her medications. [R327]. Plaintiff stated that she was hearing voices that told her to harm herself and other people. [R327]. The treating physician, Dr. Michael Dorcik, diagnosed Plaintiff with paranoid schizophrenia, unspecified condition, and with an adjustment disorder with mixed anxiety and depressed mood. [R328]. Plaintiff was restarted on Remeron, and her citalopram and risperidone were increased. [R328].

On May 19, 2014, state agency physician Bryman Williams, Ph. D., reviewed the record and opined that Plaintiff appeared capable of understanding and carrying out instructions, could maintain attention and concentration adequately for two-hour periods in an eight-hour workday, could complete a normal forty-hour week of work without excessive interruptions from psychological symptoms, could relate appropriately to coworkers and supervisors on a limited basis, and could adapt to a job setting. [R87, 97].

On May 28, 2014, Plaintiff told a case worker at Coastal that she was having a "very bad day and felt like blowing her head off." [R394]. A therapist, Genia Crane,

called Plaintiff and was able to talk through the crisis. [R394]. Plaintiff stated that she did not have any actual plans to commit suicide. [R394]. At therapy on June 6, 2014, Plaintiff reported that she was "doing somewhat better" and that her medications were helping. [R393].

Plaintiff returned to Coastal for further treatment on June 18, 2014. [R325, 388]. She stated that she was still hearing voices that told her to harm herself and others when she was driving her car and that although she was able to ignore the voices, they were disturbing to her. [R325, 388]. Plaintiff also reported anxiety, depression, insomnia, moodiness, and disturbing thoughts or feelings. [R326, 389]. The nurse practitioner discontinued Plaintiff's prescription for risperidone and placed her on Vistaril[17] and Zyprexa.[18] [R326, 389-90].

On August 6, 2014, Plaintiff told a Coastal nurse practitioner that she was having problems with fatigue, anxiety, mood swings, paranoia, and weight gain. [R318, 321,

_____

[17]     Vistaril (hydroxyzine) is used to relieve the itching caused by allergies, to control nausea and vomiting, to relieve anxiety and tension, and to treat the symptoms of alcohol withdrawal. MedlinePlus, Hydroxyzine, https://medlineplus.gov/druginfo/meds/a682866.html (last visited 8/8/18).

[18]     Zyprexa (olanzapine) is used to treat schizophrenia and bipolar disorder. It is in a class of medications called atypical antipsychotics. MedlinePlus, Olanzapine, https://medlineplus.gov/druginfo/meds/a601213.html (last visited 8/8/18).

AO 72A
(Rev.8/8
2)

378].  A psychiatric examination showed that Plaintiff was well-oriented; displayed appropriate behavior, mood, and affect; was not fearful or forgetful; denied feelings of hopelessness; and had normal attention, concentration, insight, and judgment.  [R318, 320, 378, 380].  The noted diagnosis was schizophrenia, unspecified type.  [R321, 381].

On October 3, 2014, Plaintiff returned to Coastal with complaints of anxious and fearful thoughts, a depressed mood, difficulty concentrating, insomnia, diminished interests, feelings of guilt, loss of appetite, paranoia, and poor judgment. [R314-15, 370-71].  Plaintiff reported that her depression was aggravated by poor sleep and was associated with irritability and weight gain and that her symptoms were not relieved by medication.  [R314, 370].  She denied other symptoms such as excessive worrying, hallucinations, restlessness, or thoughts of suicide.  [R315, 371].  Charles Bounds, M.D., observed Plaintiff to have appropriate behavior that was not euphoric or fearful and diagnosed Plaintiff with major depressive disorder, recurrent episode, moderate, and schizophrenia, unspecified type.  [R316, 372].  There were also references to anhedonia,[19] anxiety, inappropriate mood and affect, hopelessness, and poor attention and concentration.  [R316, 372].

_____

[19]     Anhedonia is the inability to derive pleasure from activities that would ordinarily be pleasurable.  *PDR Med. Dictionary* 90 (1st ed. 1995).

AO 72A
(Rev.8/8
2)

On February 16, 2015, Plaintiff returned to Coastal with complaints that her depressive symptoms had worsened. [R309]. She reported anxious and fearful thoughts, insomnia, excessive worrying, feelings of guilt, and thoughts of death or suicide. [R309]. Upon psychiatric examination, Plaintiff was found to be oriented to time, person, and place; to have an appropriate mood, affect, and behavior; to not be anxious, hopeless, paranoid, or forgetful; to have no anhedonia or mood swings; to have a sufficient fund of knowledge; to have normal insight, judgment, attention, and concentration; and to have a normal attention span. [R312]. She denied any flights of ideas; grandiosity; hallucinations; memory loss; mood swings; or obsessive thoughts. [R312]. Plaintiff was referred to a psychiatrist for further treatment. [R312].

On March 15, 2015, Angelos Vamvakas, M.D., of Coastal saw Plaintiff for a psychiatric evaluation. [R305-08]. Plaintiff told Dr. Vamvakas that she was suffering from bipolar disorder, schizophrenia, and depression; complained that she had gained thirty pounds while on Seroquel[20]; and related that she had not been feeling like herself over the past three years, that she was isolating herself from others and did not have any energy or motivation, that she sometimes did not want to get out of bed in the morning,

---

[20]     Seroquel (quetiapine) is an atypical antipsychotic medication used to treat the symptoms of schizophrenia, mania, and depression. MedlinePlus, Quetiapine, http://medlineplus.gov/druginfo/meds/a698019.html (last visited 8/8/18).

AO 72A
(Rev.8/8
2)

and that when she drives she hears a male voice in her head telling her to "take [herself] out of this misery." [R305]. Plaintiff also stated that she had been using medications for several years but did not feel that her doctors had her best interests at heart and that several of her doctors were "bipolar themselves." [R305]. Plaintiff also told Dr. Vamvakas that she felt that he "was looking at her and pitying her for not being good enough." [R305].

Dr. Vamvakas's mental-status examination showed that Plaintiff had good eye contact, with normal motor activity and speech; displayed paranoid traits; and had a depressed mood. [R305]. Her affect was restricted but became more animated when Dr. Vamvakas confronted her about not having followed up consistently for mental-health treatment. [R305]. Plaintiff's insight and judgment were deemed "fair." [R305]. Dr. Vamvakas diagnosed Plaintiff with major depressive disorder, recurrent episode, moderate degree; further observed that Plaintiff's "paranoid traits and ambivalence are very substantial and may indicate a personality disorder"; and directed

her to take Geodon[21] as prescribed and to taper off Seroquel and doxepin.[22] [R305, 307].

Upon referral of her hearing attorney, Plaintiff underwent a psychological evaluation with Dr. Massong on January 13, 2016. [R419-22]. Plaintiff described herself as healthy, aside from symptoms of depression and anxiety that surfaced in 2011 and 2012, and without any medical diagnoses. [R420].

Dr. Massong observed that based on Plaintiff's speech, thought process, affect, and mannerisms, she appeared to be towards the lower end of average general intellectual functioning; that she did not evidence any major deficiencies in her activities of daily living; that her mental status was within normal limits and commensurate with her intellectual functioning; and that her thoughts were well-organized, rational, and not consistent with a schizophrenia-spectrum disorder. [R421]. Dr. Massong additionally noted that Plaintiff evidenced no symptoms

---

[21]     Geodon (ziprasidone) is an atypical antipsychotic medication used to treat symptoms of schizophrenia and to treat "episodes of mania (frenzied, abnormally excited or irritated mood) or mixed episodes (symptoms of mania and depression that happen together) in patients with bipolar disorder." MedlinePlus, Ziprasidone, https://medlineplus.gov/druginfo/meds/a699062.html (last visited 8/8/18).

[22]     Doxepin is a tricyclic antidepressant that may be used to treat insomnia or to treat depression and anxiety. MedlinePlus, Doxepin (Insomnia), https://medlineplus.gov/druginfo/meds/a617017.html (last visited 8/8/18).

AO 72A
(Rev.8/8
2)

suggestive of psychosis and that she denied any suicidal ideation/intent; opined that Plaintiff revealed symptoms of at least moderate dysphoria/anxiety and diminished self-esteem with a tendency to ruminate or obsess; and described Plaintiff as showing clear preoccupation and possible traumatization with the details of her loss of employment. [R421].

After reviewing Plaintiff's medical records and conducting a mental-status examination, Dr. Massong wrote that there were "several key components" that contributed towards Plaintiff's "emotional collapse" in 2012: Plaintiff "is a highly sensitive, private, naive, and somewhat immature individual," which made her "vulnerable to interpersonal misunderstanding and poor judgment"; she developed an acute stress reaction after being harassed by her supervisor and had later begun to suffer symptoms of PTSD, such as avoidance and withdrawal, intrusive, distressing thoughts, severe insomnia, preoccupation with a traumatic event, and periods of emotional lability[23]; and over time, the stress reaction "metastasized" into a PTSD-type illness with a co-morbid recurrent major depressive disorder. [R421-22]. Dr. Massong further opined that Plaintiff was "a chronically injured and disabled person who cannot re-

---

[23]    "Lability" refers to instability; in psychology or psychiatry, it denotes "free and uncontrolled mood or behavioral expression of the emotions." *PDR Med. Dictionary* 926 (1st ed. 1995).

25

AO 72A
(Rev.8/8
2)

mobilize her fragile personal resources" and had "calcified her adjustment to the losses in her personal and professional life into a reclusive retreat where she ruminates and laments about her lost identity and displays many of the maladaptive features of individuals who struggle with chronic PTSD." [R422].

Dr. Massong assessed Plaintiff with PTSD and major depressive disorder, recurrent, without psychosis. [R422]. He also opined that she had "significant psychiatric illnesses" that affected her personal and occupational functioning; that the illnesses were pervasive and unlikely to change in the future, with or without appropriate psychiatric or medical treatment; and that Plaintiff was "permanently and totally disabled from any type of competitive employment." [R422].

D.      *Vocational-Expert Testimony*

A vocational expert ("VE") also testified at the hearing before the ALJ. [R54]. When asked about the working capability of a person of Plaintiff's age, education, and work experience, who could perform work with no exertional limitations, is capable of understanding, remembering, and carrying out simple and detailed instructions necessary to perform jobs in the *Dictionary of Occupational Titles* ("DOT") rated at reasoning level two, is capable of concentrating for two-hour periods in an eight-hour workday, is capable of performing jobs that require only occasional interaction with the

26

general public, coworkers, supervisors, and is not capable of understanding, remembering, or carrying out complex instructions, the VE testified that the person could not perform Plaintiff's past work as a radiological technologist, but that the person could perform work in such representative occupations as that of a kitchen helper (medium, unskilled), a cleaner (medium, unskilled), or a hand packager (medium, unskilled). [R55-56].

## VI. ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2. The claimant has not engaged in substantial gainful activity since June 25, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: depression and anxiety (20 CFR 404.1520(c) and 416.920(c)).

. . .

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . .

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform work with no exertional limitations. She is not capable of understanding, remembering, or carrying out complex instructions, but she is . . . capable of understanding, remembering, and carrying out simple and detailed instructions as necessary to perform jobs in the DOT rated at reasoning level two. She is capable of concentrating for two-hour periods in an eight-hour workday. She is capable of performing jobs that require only occasional interaction with the public, coworkers, and supervisors.

. . .

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . .

7.  The claimant was born on January 11, 1975 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant

28

numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

. . .

11.  The claimant has not been under a disability, as defined in the Social Security Act, from June 25, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

[R20-28].

The ALJ explained that she found Plaintiff's testimony about her impairments not to be entirely credible; that she gave "little weight" to the opinions of treating-psychologist Dr. Zakaras and examining-psychologist, Dr. Massong; that she gave "some weight" to the opinion of consultative-psychologist Dr. Stoudenmire; and that she gave "great weight" to the opinions of state-agency reviewing physicians Dr. Prosser and Dr. Williams.  [R25-27].  She also explained that based on the VE's testimony that a person of Plaintiff's age, education, work experience, and RFC could perform jobs in the national economy, such as the representative occupations of kitchen helper, cleaner, and hand packager, she found that Plaintiff was not disabled.  [R27-28].

## VII.   CLAIMS OF ERROR

As noted above, Plaintiff argues that her case should be reversed and remanded to the Commissioner for further consideration because the ALJ did not offer good cause

for rejecting the opinion of Dr. Zakaras or the opinion of Dr. Massong and did not consider all of the relevant factors before rejecting Plaintiff's testimony about her symptoms. [*See generally* Doc. 22]. The Court addresses the arguments below.

## A. *Medical Opinions*

The Commissioner evaluates every medical opinion the agency receives, regardless of the source. 20 C.F.R. §§ 404.1527(c), 416.927(c); *cf.* 20 C.F.R. §§ 404.1527(b), 416.927(b) ("In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."); Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 at *4 ("[T]he [Social Security] Act requires us to consider all of the available evidence in the individual's case record in every case."). Thus, both examining and non-examining sources provide opinion evidence for the ALJ to consider in rendering a decision. 20 C.F.R. §§ 404.1527(c), (e), 416.927(c), (e). In determining the weight of medical opinions, the ALJ must consider: (1) the examining relationship; (2) the treatment relationship; (3) evidence supporting the conclusions; (4) the consistency of the opinion with the record as a whole; (5) the medical expert's area of specialty; and (6) other factors, including the amount of understanding of

AO 72A
(Rev.8/8
2)

disability programs and the familiarity of the medical source with information in the claimant's case record.  20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

"[T]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor," such that the reviewing court may determine "whether the ultimate decision on the merits is rational and supported by substantial evidence."  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (punctuation omitted).  Moreover, where an ALJ gives the opinion of a treating physician less than substantial or controlling weight, he must clearly articulate reasons establishing good cause for doing so.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Somogy v. Comm'r of Soc. Sec.*, 366 Fed. Appx. 56, 63 (11th Cir. Feb. 16, 2010) (citing *Lewis*, 125 F.3d at 1440)); SSR 96-2p, 1996 WL 374188.[24]  Good cause exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.  *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).  Failure to articulate the reasons for giving less

---

[24]    Although  20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) have been superseded and SSR 96-2p has been rescinded, they remain applicable to cases filed prior to March 27, 2017. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2017); Corrected Not. of Rescission, SSR 96-2p, 2017 WL 3928297 (Apr. 6, 2017).

AO 72A
(Rev.8/8
2)

weight to the opinion of a treating physician is reversible error. *Lewis*, 125 F.3d at 1440.

The ALJ stated that she assigned little weight to Dr. Zakaras's opinions because Dr. Zakaras's conclusions were generalized, she did not point to specific symptoms that would support her opinions of limitation, there was limited evidence of actual examinations or any recent examinations by Dr. Zakaras, and a conclusion as to the claimant's ability to work is a determination left to the Commissioner under the guidelines of SSR 96-5p. [R27]. Plaintiff argues that the ALJ did not offer good cause for discounting Dr. Zakaras's January 2013 opinion that Plaintiff had severe or moderately severe limitations in sixteen functional areas, [R352], and her December 2012 statement that Plaintiff would not be able to return to work for an "undetermined" period of time, [R355]. [Doc. 22 at 15-18]. First, she argues that the record contradicts the ALJ's finding that Dr. Zakaras failed to identify specific symptoms that supported her assessment: the doctor wrote on the disability status form that Plaintiff was "severely depressed" and would have difficulty coping with stress, [R354], that Plaintiff's depression would prevent her from dealing with patients or coping with other people in a work capacity, [R354], and that Plaintiff had deficits in her attention and concentration, [R356], and Dr. Zakaras attached copies of all of her

treatment summaries and handwritten notes, which corroborated her descriptions of Plaintiff's symptoms. [Doc. 22 at 15-16]. Second, Plaintiff argues that the ALJ erred in finding that there was limited evidence of actual examinations, as the treatment summaries and Dr. Zakaras's handwritten notes show that she saw Plaintiff for twenty-one examinations during 2012 and 2013, and that while Dr. Zakaras did not provide an extensive summary of each individual session, her treatment summaries documented Plaintiff's symptoms and provided support for her opinion, [R272, 347-48, 358, 361]. [Doc. 22 at 16]. Third, Plaintiff points out that although the ALJ correctly observed that Plaintiff had not had any recent examinations with Dr. Zakaras, the record shows that Dr. Zakaras examined Plaintiff on multiple occasions shortly before she issued her opinion in January 2013 and she therefore had sufficient professional basis to address Plaintiff's condition at that point in time, and she further argues that there is no evidence that Plaintiff's condition suddenly improved during 2014 or 2015, [R305, 422]. [Doc. 22 at 17]. Fourth, Plaintiff argues that the mere fact that Dr. Zakaras addressed the ultimate issue in the case—the issue of whether Plaintiff is disabled—was not a sufficient reason for disregarding the opinion. [Doc. 22 at 17-18 (citing SSR 96-5p)].

AO 72A
(Rev.8/8
2)

The Court finds no reversible error in the ALJ's decision to assign "little weight" to the opinions of Dr. Zakaras. The ALJ's decision shows that she considered the opinions and set forth good reason for discounting them. [R26-27].

It first bears remark that the two opinions for which Plaintiff advocates reflect unusually extreme limitations: on December 19, 2012, Dr. Zakaras stated that it was undetermined when Plaintiff would be able to return even to part-time work, [R355], and on January 11, 2013, Dr. Zakaras opined that Plaintiff had moderately severe limitations in the areas of ability to relate to other people, restriction of daily activities, deterioration of personal habits, ability to understand, carry out, and remember instructions, ability to perform work where contact with others will be minimal, ability to perform tasks involving minimal intellectual effort, and ability to perform repetitive tasks, [R352]; that she had severe limitations in the areas of constriction of interests, ability to respond appropriately to supervision, ability to perform work requiring regular contact with others, ability to perform intellectually complex tasks requiring higher levels of reasoning, math, and language skills, ability to perform varied tasks, ability to make independent judgment, ability to supervise or manage others, ability to perform under stressful, dangerous, or unusual circumstances, and "ability to work relative to the attached job description," [R352]; and that there were no areas of

AO 72A
(Rev.8/8
2)

functional ability in which she had any less than moderately severe limitations, [R352]. As the ALJ found, however, despite Dr. Zakaras's having issued these opinions of extreme limitation, her treatment records are brief and generalized and do not include mental-status findings, notes of any objective testing, or even notes of specific symptoms, and thus, there is scant support for the assessed limitations or the opinion that Plaintiff was unable to work. [*See* R26-27]. Indeed, Plaintiff's own argument underscores the reasonableness of the ALJ's explanation that Dr. Zakaras's opinions were generalized and failed to identify specific symptoms to support her assessment, as Plaintiff herself was able to point only to generalized findings that Plaintiff was "severely depressed" and would have difficulty coping with stress and generalized opinions that Plaintiff's depression would prevent her from dealing with patients or coping with other people in a work capacity and caused her to have deficits in her attention and concentration. [*See* Doc. 22 at 15-16]. It also bears noting that the ALJ considered Dr. Zakaras's report that she terminated treatment in November 2013 due to resolution of depression, which further detracts from the credibility of the extreme limitations set forth in Dr. Zakaras's January 2013 opinion, even if Plaintiff later complained of symptoms of depression. [*See* R27]. Consequently, the undersigned finds no reversible error in the ALJ's consideration of the opinion of Dr. Zakaras.

AO 72A
(Rev.8/8
2)

The Court finds the ALJ's consideration of Dr. Massong's opinion problematic, however. The ALJ stated that she assigned little weight to Dr. Massong's opinion because it was "inconsistent with the opinions of treating sources with a longitudinal treatment record [sic] [;] . . . the conclusions of the prior service provider who terminated treatment due to the resolution of depression[;] . . . [and] the opinion of Dr. Stoudenmire." [R27]. Plaintiff argues that this explanation does not demonstrate that the ALJ had good cause for discounting the opinion of Dr. Massong because the three reasons that the ALJ gave for discounting the opinion were not supported by the record: she first contends that the ALJ erred in suggesting that Dr. Massong's opinion was inconsistent with the opinions of treating sources because the only treating source who provided a medical opinion about Plaintiff's functioning was Dr. Zakaras, and her opinion was entirely consistent with that of Dr. Massong, [Doc. 22 at 19 (citing [R352, 354-56])]; second, she argues that the record does not support the ALJ's finding that Plaintiff's depression had resolved, [Doc. 22 at 19-20]; and third, Plaintiff contends that Dr. Stoudenmire's opinion does not contradict the opinion of Dr. Massong but rather that Dr. Stoudenmire's belief that Plaintiff had a "poor" prognosis and probably would not improve without extended medical care actually supported Dr. Massong's conclusion that Plaintiff was unable to meet the mental demands of competitive

36

employment, [Doc. 22 at 20 (citing [R290])].  In response, the Commissioner contends that the ALJ properly rejected Dr. Massong's opinion, as the issue of whether an individual is "disabled" or "unable to work" is an issue reserved for the Commissioner; the ALJ "thoroughly discussed" Dr. Massong's opinion and explained that she gave it little weight because it is inconsistent with the treatment record as a whole, [R27]; Dr. Massong's mental-status findings were also inconsistent with his opinion, [R419-22]; and the record shows that Dr. Zakaras had stated that Plaintiff's "treatment terminated as depression resolved 11/17/13 was last session [sic]," [R270]. [Doc. 23 at 16-17 & n.4].

After careful review, the undersigned finds that the ALJ's reasons for discounting the opinion of Dr. Massong conflict with the record.  As Plaintiff points out, Dr. Zakaras is the only treating source who supplied an opinion, and she opined that Plaintiff's limitations were moderately severe or worse, [*compare* R27 *with* R352, 421-22], and while the record does indicate that Dr. Zakaras reported ending Plaintiff's treatment in November 2013 because her depression had resolved, [R270], the longitudinal treatment record shows that Plaintiff continued to seek mental-health treatment and receive diagnoses of depression and other mental-health disorders, [R298 (February 2014 diagnosis of generalized anxiety disorder); R290 (March 31, 2014,

AO 72A
(Rev.8/8
2)

diagnosis of major depressive disorder with anxiety features); R296 (April 7, 2014, diagnosis of adjustment disorder with mixed anxiety and depression); R328 (May 12, 2014, diagnosis of paranoid schizophrenia with an adjustment disorder with mixed anxiety and depressed mood); R316, 372 (October 3, 2014, diagnosis of major depressive disorder, recurrent, moderate, and schizophrenia); R312 (February 16, 2015, referral to a psychiatrist for further treatment); R305 (March 15, 2015, diagnosis of major depressive disorder, recurrent, moderate, and observation that substantial paranoid traits and ambivalence may indicate a personality disorder)]. Thus, the ALJ's explanation that Dr. Massong's opinion is due to be given little weight because it is inconsistent with the opinion of Dr. Zakaras and the resolution of Plaintiff's depression lacks the support of substantial evidence. It is likewise unclear how Dr. Stoudenmire's opinion could be seen to undermine Dr. Massong's opinion, as Dr. Stoudenmire diagnosed major depressive disorder with anxiety features, found Plaintiff's attention and concentration skills to be "fair at best," found her only "marginally capable of managing any funds that might be assigned," and found that her prognosis was poor. [*Compare* R27 *with* R290, 421-22].

Additionally, while Dr. Massong's statement that Plaintiff's "mental status is WNL," [R421], is arguably inconsistent with his opinions that Plaintiff shows

38

symptoms of at least moderate dysphoria/anxiety, diminished self-esteem with a tendency to ruminate/obsess, and preoccupation and traumatization regarding her loss of employment, displays "maladaptive features of individuals who struggle with chronic PTSD," and has "significant psychiatric illnesses with resulting detrimental consequences for [Plaintiff's] personal and occupational functioning," [*see* R421-22], and thus could be seen as detracting from Dr. Massong's opinions of limitation and disability, this reasoning does not appear in the ALJ's decision, [*see* R27]. A court cannot draw post hoc conclusions from the evidence but instead must determine whether the ALJ properly applied the law and supported the decision with substantial evidence. *Baker v. Comm'r of Soc. Sec.*, 384 Fed. Appx. 893, 896 (11th Cir. June 23, 2010) ("If an action is to be upheld it must be upheld on the . . . bases articulated in the agency's order.") (citing *FPC v. Texaco, Inc.*, 417 U.S. 380, 397 (1974)); *Patterson v. Chater*, 983 F. Supp. 1410, 1413 (M.D. Fla. 1997) (holding that it is the duty of the ALJ—and not the court—to draw inferences from the evidence and resolve conflicts in the evidence). Thus, the Court concludes that it may not affirm the decision of the Commissioner on such grounds.

For all of these reasons, the undersigned concludes that the ALJ's decision does not supply substantial evidence to support her choice to credit the opinions of the

AO 72A
(Rev.8/8
2)

reviewing physicians over the opinion of Dr. Massong.[25]  The matter is therefore due

to be remanded for further proceedings.

B.    *Credibility Analysis*

Because the medical record was not properly considered, it necessarily follows

that the credibility analysis also could not have been supported by substantial evidence.

*See Foote*, 67 F.3d at 1560 (explaining that when a claimant attempts to establish

---

[25]    The Court additionally notes that even if Dr. Prosser's and Dr. Williams's reviewing opinions were sufficient to support the ALJ's RFC at the time they were rendered, the decision is not grounded by substantial evidence because the ALJ did not properly develop the record.  Dr. Prosser's opinion was issued on April 15, 2014, and Dr. Williams's opinion was issued on May 12, 2014.  [R64-65, 68, 73-74, 77, 87, 97].  As a consequence, the physicians necessarily arrived at their determinations regarding Plaintiff's limitations without the benefit of knowing that Plaintiff would continue to show symptoms of diminished mental health.  [*See, e.g.*, R394 (Plaintiff's May 28, 2014, report to a caseworker that she was having a "very bad day and felt like blowing her head off"); R325, 388 (Plaintiff's June 18, 2014, report that she was hearing voices that told her to harm herself and others); R316, 372 (October 3, 2014, references to anhedonia, anxiety, inappropriate mood and affect, hopelessness, and poor attention and concentration); R312 (February 16, 2015, referral to a psychiatrist for further treatment); R305, 307 (March 15, 2015, psychiatric evaluation resulting in diagnosis of major depressive disorder, recurrent, moderate, and observation that Plaintiff's paranoid traits and ambivalence were substantial and may indicate a personality disorder); R421 (January 13, 2016, psychological evaluation indicating symptoms of at least moderate dysphoria/anxiety and diminished self-esteem with a tendency to ruminate or obsess, clear preoccupation, and possible traumatization with details of loss of employment; diagnosis of PTSD and major depressive disorder)].  Simply put, the opinions of Dr. Prosser and Dr. Williams —the only medical opinions of Plaintiff's limitations upon which the ALJ appears to have relied—are stale.

AO 72A
(Rev.8/8
2)

disability through her own testimony of subjective symptoms, the ALJ must consider the claimant's testimony regarding the symptoms if she finds evidence of an underlying medical condition and either objective medical evidence that confirms the severity of the alleged symptom arising from that condition or that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged symptom). Additionally, the Court finds that the ALJ separately erred in her credibility analysis when she suggested that Plaintiff's poor performance during the consultative examination with Dr. Stoudenmire was a sign that she was malingering, [R25], as Dr. Stoudenmire did not make any such finding in his report, [R289-90], Dr. Stoudenmire in fact remarked that Plaintiff was cooperative and motivated during the interview, [R287], and the ALJ appears to have failed to acknowledge that Dr. Massong specifically noted that Plaintiff "reveal[ed] no indicators of symptom exaggeration or malingering," [R422]. *See Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015) ("The ALJ has a basic duty to develop a full and fair record."); *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986) (holding that an administrative decision is not supported by "substantial evidence" where the ALJ acknowledges only the evidence favorable to the decision and disregards contrary

41

AO 72A
(Rev.8/8
2)

evidence).  Thus, the Commissioner must also reconsider Plaintiff's credibility upon remand.[26]

## VIII.  CONCLUSION

For the reasons above, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this opinion.  The Clerk is **DIRECTED** to enter final judgment in Plaintiff's favor.

**IT IS SO ORDERED and DIRECTED**, this the 9th day of August, 2018.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

_____

[26]      Because the ALJ's discussion of Plaintiff's testimony addresses her statements regarding cooking, chores, and side effects of medication, [R25], the Court does not find additional grounds for reversal in the ALJ's alleged failure to take into account Plaintiff's hearing testimony that she almost burned down her home after forgetting that she left food on the stove, [R51-52]; her testimony that she lacks the motivation to perform even basic household chores, [R50-51]; and evidence regarding Plaintiff's medication and the side effects she has experienced, [R305, 314, 339, 344, 370]. [Doc. 22 at 22-24].  Nonetheless, the Commissioner should address this evidence upon remand in conjunction with her reconsideration of the medical evidence and the lack of evidence of malingering.

AO 72A
(Rev.8/8
2)